JUDGE CROTTY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**11 CIV 3828**

JAMES MERCER,

        Plaintiff,

    and

THE GOLDMAN SACHS GROUP, INC.

        Nominal Plaintiff,

    v.

RAJAT K. GUPTA,

        Defendant.

NO. 11-cv-

COMPLAINT FOR RECOVERY
OF SHORT-SWING PROFITS
UNDER SECTION 16(b) OF THE
SECURITIES EXCHANGE ACT
OF 1934

AND

JURY DEMAND



Plaintiff James Mercer, by and through his attorneys, Keller Rohrback L.L.P. and Gordon Tilden Thomas & Cordell LLP, alleges as follows:

**IDENTIFICATION OF PARTIES AND NON-PARTY RAJARATNAM**

1.    ***Plaintiff Mercer.*** Plaintiff James Mercer is a resident of Kirkland, Washington, in King County. He is a shareholder of nominal plaintiff The Goldman Sachs Group, Inc.

2.    ***Nominal Plaintiff Goldman Sachs.*** Nominal plaintiff The Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation headquartered in New York, New York. Goldman Sachs is an investment banking, securities, and investment management firm that provides financial services to corporations, financial institutions, governments, and high-net-worth individuals.

- 1 -

3. ***Defendant Gupta***.  Defendant Rajat K. Gupta is a resident of Westport,
Connecticut, in Fairfield County.  Mr. Gupta was a member of Goldman Sachs'
board of directors from November 2006 through May 2010.  During this time, Mr.
Gupta served as a member of the Board's Audit Committee, Corporate Governance
and Nominating Committee, and Compensation Committee.  Mr. Gupta was also a
Founding Partner and Chairman of New Silk Route Partners LLC ("NSR").  NSR is
an India-focused private equity investment firm that was originally called Taj
Capital Partners.  NSR was co-founded by Mr. Gupta, Raj Rajaratnam, and others
in 2006.  Mr. Gupta and Mr. Rajaratnam have a history that includes other co-
investments and interlocking business collaborations—both before and after NSR.

4. ***Non-party Rajaratnam***.  Non-party Raj Rajaratnam resides in New
York, New York.  Mr. Rajaratnam was the founder of New York-based The Galleon
Group, a family of hedge funds and hedge fund management entities, that included
fund advisors Galleon Management, L.P., Galleon International Management,
L.L.C., and other Galleon affiliates for which Mr. Rajaratnam was the managing
general partner and member, respectively (collectively, "Galleon").  During the
relevant period, Mr. Rajaratnam had control over all Galleon hedge funds and
Galleon-related funds, including its International Fund, Voyager Multi-Strategy
Fund, and its "Tech funds" that included the Technology Offshore Fund, Technology
Partners Fund, Technology MAC Fund, and Diversified Fund.  According to the
United States Securities and Exchange Commission ("SEC"), Galleon had over $2.6
billion under management as of March 2009.  Galleon began to liquidate itself and

the hedge funds it advised after the October 16, 2009, insider trading arrest of Mr. Rajaratnam. Federal prosecutors charged Mr. Rajaratnam with 14 counts of insider trading, including trading based on inside information about Goldman Sachs that was provided by Mr. Gupta while he was member of the Goldman Sachs board of directors. The Rajaratnam insider trading trial was held in this Court, before a jury. Mr. Gupta, whom federal prosecutors called an unindicted co-conspirator, did not testify but was prominently featured—his name mentioned during almost every trial day. On May 11, 2011, the jury reached a unanimous verdict: guilty on all 14 counts.

## JURISDICTION AND VENUE

5.    *Jurisdiction.* Jurisdiction in this Court arises under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

6.    *Venue.* Venue is proper in this Court under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

## BACKGROUND ON SECTION 16

7.    *Curbing "the Evils of Insider Trading."* Section 16(b) of the Securities Exchange Act of 1934 ("the Act") is the only federal statute enacted by Congress specifically "to curb the evils of insider trading." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). The statute "imposes a strict prophylactic rule with respect to [statutory] insider, short-swing trading." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976). Statutory insiders include officers, directors, and shareholders with more than a 10 percent interest in the issuing company. 15 U.S.C. § 78p(b).

- 3 -

8.   *Strict Liability; Disgorgement to Issuer.*  Statutory insiders are "presumed to have access to inside information."  *Foremost-McKesson*, 423 U.S. at 243.  When insiders have a beneficial ownership in issuer securities traded within any six month period ("short-swing trading"), the insiders must disgorge any profits from those trades to the issuer.  15 U.S.C. § 78p(b); *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595 (1973).

9.   *SEC Cannot Enforce Section 16(b).*  Congress did *not* give the SEC *any* role in enforcing Section 16(b).  *Gollust v. Mendell*, 501 U.S. 115, 122 (1991).  Congress permitted only private enforcement and relies on private attorneys to spearhead that effort:

> Congress left enforcement of section 16(b) cases to shareholders and consequently to the attorneys who find such cases and represent the shareholders who consent to be plaintiffs. The SEC was given no role in enforcing section 16(b).  Thus, section 16(b) can be enforced and the market's integrity can be protected, only if attorneys are willing to invest the time and energy, and assume the risk, that is involved in investigating numerous SEC filings in the search to uncover insiders who make improper short swing profits, and filing lawsuits against those unwilling to return such profits.

*Klein v. Salvi*, No. 02 Civ. 1862 (AKH), 2004 WL 596109, at *10 (S.D.N.Y. Mar. 30, 2004), *aff'd*, 2004 WL 2931121 (2d Cir. 2004).

10.   *Insiders Are Required to File Section 16(a) Reports with the SEC.*  Section 16(a) is integral to Section 16(b) enforcement.  Section 16(a) requires insiders to publicly disclose their short-swing securities transactions in order to combat the practices Congress enacted Section 16(b) to prevent.  15 U.S.C. § 78p(a); *see also Interpretive Release on Rules Applicable to Insider Reporting and Trading,*

46 Fed. Reg. 48147-01 (Oct. 1, 1981) (footnotes omitted); *Gollust*, 501 U.S. at 121

(describing purpose of Section 16(b) as ensuring "maintenance of fair and honest

markets" through elimination of profits from insider, short-swing trading);

*Foremost-McKesson*, 423 U.S. at 243-44 (same); *Kern County Land*, 411 U.S. at 592

(same; setting out legislative history). The disclosures required by Section 16(a) are

commonly known as "Section 16(a) reports." "The disclosures and reports of § 16(a)

are an integral part of the context of § 16 within which § 16(b) must be read."

*Whittaker v. Whittaker Corp.*, 639 F.2d 516, 528 (9th Cir. 1981). The information

in Section 16(a) reports is the "main source of information for suits Congress has

empowered [shareholders] to bring" under Section 16(b). *Id.*; *see also Litzler v. CC

Invs., L.D.C.*, 362 F.3d 203, 207 (2d Cir. 2004) ("The prophylaxis of Section 16 works

by imposing an absolute duty of disclosure" through Section 16(a) reporting).

    11.   ***Section 16(a) Information***. Section 16(a) reports contain, *inter alia*,

short-swing trading details. The reports require statutory insiders to disclose: (a)

the identity of the reporting person; (b) whether the reporting person is an officer,

director, or 10 percent shareholder; (c) whether the reporting person is filing

individually or as part of a "group"; (d) the dates of the reported short-swing trades;

and (e) the amounts, prices, and nature of the securities acquired, disposed of, or

beneficially owned. *See* **Exhibit 1** (blank Section 16(a) report); 15 U.S.C. § 78p(a).

Section 16(a) reports allow the examining shareholder to discover and isolate the

dates of the trades at issue, mathematically compute the short-swing profits to be

disgorged, identify the statutory insiders as individuals or groups, and pinpoint the

shares in which the insiders have or share "a direct or indirect pecuniary interest."
17 C.F.R. § 240.16a-1(a)(2).  Without Section 16(a) reports, outside shareholders
have no access to specific short-swing profit and other Section 16(b) claim-related
information.

### FAILURE TO COMPLY WITH SECTION 16(a) REPORTING REQUIREMENT TOLLS SECTION 16(b) TWO-YEAR STATUTE OF LIMITATIONS

12.  *Nondisclosure of Section 16(a) Information*.  Neither Mr. Gupta, nor
any other person or entity, has reported the short-swing transactions at issue in
this case as required under Section 16(a).  Nor is all the information required to be
disclosed under Section 16(a) otherwise available for public scrutiny.

13.  *Tolling of Statute of Limitations*.  The failure to disclose Section 16(a)
information tolls the two-year statute of limitations set forth in Section 16(b).  *See,
e.g., Litzler v. CC Invs., L.D.C.*, 362 F.3d 203, 207 (2d Cir. 2004); *Whittaker*, 639
F.2d at 528-29; *Capitol First Corp. v. Todd*, No. 04-6439 (MLC), 2006 WL 3827329
(D.N.J. Dec. 27, 2006); *Dreiling v. Am. Online, Inc.*, No. C05-1339JLR, 2005 WL
3299828 (W.D. Wash. Dec. 5, 2005); *Segen v. Comvest Venture Partners, LP*, No.
Civ.A. 04-822 JJF, 2005 WL 1320875 (D. Del. June 2, 2005); *Tyco Int'l Ltd. v.
Kozlowski*, No. MDL 02-1335-B, Civ. 03-CV-1339-PB, 2005 WL 927014 (D.N.H. Apr.
21, 2005); *Dreiling v. Am. Express Travel Related Servs. Co., Inc.*, 351 F. Supp. 2d
1077 (W.D. Wash. 2004); *Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital
Mgmt., Co., Ltd.*, 179 F. Supp. 2d 330 (S.D.N.Y. 2002); *Morales v. Executive
Telecard, Ltd.*, No. 95 Civ. 10202(KMW), 1998 WL 314734 (S.D.N.Y. June 12, 1998);
*Shattuck Denn Mining Corp. v. La Morte*, No. 67 Civ. 3222, 1974 WL 373 (S.D.N.Y.

Mar. 8, 1974); *Blau v. Albert*, 157 F. Supp. 816 (S.D.N.Y. 1957); *Grossman v. Young*, 72 F. Supp. 375 (1947); *Dreiling v. Kellett*, No. C01-1528P (Dkt. 114) (W.D. Wash. Feb. 14, 2003) (denying defendants' summary judgment motion); *see also* PETER ROMEO & ALAN DYE, SECTION 16 § 9.03[3][b] at 872 n.107 (3d ed. 2008).

14.     ***Section 16(a) Information Remains Unknown***.  Because the short-swing transactions in Goldman Sachs securities beneficially owned by Mr. Gupta have not been reported as required by Section 16(a), most of the relevant trading details remain unknown to Plaintiff at this time.

## STATUTORY DEMAND AND VESTING OF SECTION 16(b) CLAIMS

15.     ***SEC Order***.  On March 1, 2011, the SEC entered an order commencing administrative and cease-and-desist proceedings against Mr. Gupta ("SEC Order"). *See* SEC Admin. Proceeding File No. 3-14279.  A true and correct copy of the SEC Order is attached as **Exhibit 2** hereto.  The SEC Order followed an investigation that culminated in allegations issued by the SEC Division of Enforcement.  Among other things, the SEC determined that Mr. Gupta on "a number of occasions" divulged to Mr. Rajaratnam material nonpublic information that Mr. Gupta obtained in the course of his duties as a member of the Goldman Sachs board.  *Id.* ¶ 1.  Mr. Rajaratnam, "in turn":

> either caused the Galleon hedge funds that he managed to trade based on the material nonpublic information, or passed the information on to others at Galleon and caused trades based on the information.

> Specifically, Gupta disclosed to Rajaratnam material nonpublic information concerning Berkshire Hathaway Inc.'s ("Berkshire") $5 billion investment in Goldman Sachs before it was publicly announced on September 23, 2008, as well as Goldman Sachs's

> financial results for both the second and fourth quarters of 2008.
> Rajaratnam caused the various Galleon hedge funds that he
> managed to trade based on the material nonpublic information,
> generating illicit [and short-swing] profits and loss avoidance of
> more than $17 million.

*Id.* ¶¶ 1-2.  The SEC Order contains, *inter alia*, trading details and information

from private phone calls between Mr. Gupta and Mr. Rajaratnam and others, as

well as private telephone records and calendar entries—all of which were previously

unknown by shareholders and members of the public such as Plaintiff.  *Id.* ¶¶ 12-33.

16.   ***Summary of Mr. Gupta's Section 16(b) Disgorgement Obligation.***  As

discussed in detail herein, Mr. Rajaratnam/Galleon engaged in short-swing trading

(trading within a period of less than six months) of Goldman Sachs securities, which

generated substantial profits.  Mr. Gupta was beneficial owner of these securities

because he had a pecuniary interest in the profits generated by this trading

activity.  Mr. Rajaratnam undoubtedly paid Mr. Gupta for the Goldman Sachs

inside information on which these trades were made.  Mr. Gupta was a Section

16(b) statutory insider because he was a Goldman Sachs director at all relevant

times.  Pursuant to Section 16(b), Mr. Gupta, as a statutory insider and beneficial

owner of securities traded profitably on the short swing, must therefore disgorge all

profits from these trades to issuer Goldman Sachs.

17.   ***Statutory Demand Letter.***  By letter dated March 11, 2011, which was

faxed and mailed to the Goldman Sachs board of directors on that date, Plaintiff, in

his capacity as a Goldman Sachs shareholder, made a 60-day demand on Goldman

Sachs pursuant to Section 16(b).  The demand letter identified Plaintiff as a

Goldman Sachs shareholder; identified Mr. Gupta as the statutory insider;
explained that Mr. Gupta failed to file Section 16(a) reports with the SEC; set out
particulars of Mr. Gupta's conduct and his relationship with Mr. Rajaratnam, and
otherwise summarized the factual basis for the Section 16(b) claim; demanded that
Goldman Sachs initiate an action against its former director within 60 days from
the date of the letter; advised Goldman Sachs of Plaintiff's right to institute his own
action if Goldman Sachs does not do so within the 60-day period; and asked that
board members contact Plaintiff's attorneys directly if they would like to discuss, or
have any questions regarding, the demand or the Section 16(b) claim against Mr.
Gupta.  Plaintiff's demand also included a copy of the SEC Order, and directed the
board's attention specifically to paragraphs 12-33 thereof.

18.     ***Second Letter Transmitting the Complaint.***  Plaintiff continued to
advise the Goldman Sachs board of directors of developments in an effort to keep
the board informed of the claim.  The recent criminal trial of Mr. Rajaratnam
provided additional details that support the claim against Mr. Gupta.  These
additional details were provided through various means including government
wiretapped phone calls between Mr. Gupta and Mr. Rajaratnam, and others, as well
as telephone call logs and some (but certainly not all) relevant trading records, all of
which were first made public during the Rajaratnam trial and after Plaintiff had
issued his demand.  They were then incorporated into this Complaint.  By letter
dated May 24, 2011 (sent 74 days after his demand), Plaintiff provided the Goldman
Sachs board with a draft of this Complaint and, once again, asked that board

members contact Plaintiff's attorneys directly if they would like to discuss, or have any questions regarding, Plaintiff's prior demand or his Section 16(b) claim against Mr. Gupta.

19.     ***Third Letter Transmitting the Complaint***.  By letter dated May 27, 2011, Plaintiff provided Mr. Gupta's attorneys with another draft of this Complaint. Plaintiff also provided a copy of the letter and draft Complaint to the Goldman Sachs board.

20.     ***Failure to Comply with Demand.***  More than 60 days have elapsed since Plaintiff's demand.  Goldman Sachs has neither initiated an action against Mr. Gupta nor given an indication that it intends to.  In fact, Goldman Sachs, to date, has not responded either to the March 11, 2011 demand, the May 24, 2011 letter that included a draft of this Complaint, or the May 27, 2011 letter that likewise included a draft of this Complaint.

21.     ***Vesting of Claims in Plaintiff.***  As a result of Goldman Sachs' failure to comply with Plaintiff's demand, all rights to maintain this action have vested fully in Plaintiff pursuant to Section 16(b).  Goldman Sachs is named herein only as a nominal plaintiff as it remains the statutory beneficiary of any Section 16(b) recovery.

## MR. GUPTA'S DISCLOSURE TO MR. RAJARATNAM OF GOLDMAN SACHS' SECOND QUARTER 2008 FINANCIAL RESULTS

22.     ***June 10, 2008 Blankfein-Gupta Conference Call.***  According to the SEC Order, on June 10, 2008, at 5:41 p.m., Goldman Sachs CEO Lloyd Blankfein placed a call to Mr. Gupta that lasted more than 8 minutes.  The call was one of several

Mr. Blankfein made to various Goldman Sachs outside directors around the same time that evening. Mr. Blankfein's practice was to apprise directors, such as Mr. Gupta, of the then-current (and then-confidential) financial status of the firm when he spoke to them. *See* SEC Order ¶ 26. Goldman Sachs' second quarter of 2008 had ended on May 30, 2008. According to the SEC, by June 10, 2008, the company's financial reporting team had already compiled and analyzed the quarterly financial data and put together a draft earnings press release that had been circulated to various financial personnel, including CFO David Viniar, prior to Mr. Blankfein's call with Mr. Gupta. The company's financial performance was strong in an extremely difficult environment, and significantly better than analyst consensus estimates. Mr. Blankfein knew the earnings numbers (which were positive) and discussed them with Mr. Gupta during their June 10, 2008, telephone conversation. *See* SEC Order ¶¶ 27-28.

23.    *Insider Trading on June 11-12, 2008.* According to the SEC, on the night of June 10, 2008, at 9:24 p.m., Mr. Gupta placed a short call to Mr. Rajaratnam's home. The call was the first in a "flurry" of calls between the two over an 18 minute span that night. It ended with a four minute call from Mr. Rajaratnam to Mr. Gupta, at 9:42 p.m. On the following morning, June 11, at 8:43 a.m., Mr. Rajaratnam placed another call to Mr. Gupta that lasted about two and a half minutes. Beginning at 9:35 a.m., five minutes after the markets opened, Mr. Rajaratnam caused the Galleon Tech funds to significantly increase an existing long position it had established in Goldman Sachs shares by purchasing over 5,500

Goldman Sachs June $170 call option contracts covering 550,000 Goldman Sachs shares (each contract covered 100 Goldman Sachs shares). Goldman Sachs' share price had opened at $167.00 per share on June 11. *See* SEC Order ¶ 29. Mr. Rajaratnam also caused the Galleon Tech funds to purchase over 350,000 additional Goldman Sachs shares on June 11 and 12, selling only a small portion on June 13. *Id.*

24. ***Galleon Short-Swing Profits from Trading June Call Option Contracts***. On June 16, after a positive Goldman Sachs earnings preview was issued publicly sending Goldman Sachs' stock price up more than 2%, Mr. Rajaratnam caused the Galleon Tech funds to sell the June $170 call option contracts they had purchased on June 11. This short-swing trading generated actual profits of approximately $7 million according to the SEC. *See* SEC Order ¶ 30.

25. ***Announcement of "Strong" Second Quarter Results***. Goldman Sachs announced publicly its quarterly results on June 17, 2008, prior to the market opening. Revenues and earnings per share beat analysts' estimates, and Goldman Sachs' share price opened the day at $185.04 per share—about 1.62% higher than the prior day's closing price of $182.09 per share. *See* SEC Order ¶¶ 25, 32. CEO Blankfein stated he was "particularly pleased to be able to report strong results for the second quarter" "[g]iven the difficult market conditions."

26. ***Galleon Short-Swing Profits from Trading June Shares.*** After Goldman Sachs' June 17 public announcement, Mr. Rajaratnam caused the Galleon Tech funds to then sell the Goldman Sachs shares they had purchased after Mr.

Rajaratnam received Mr. Gupta's inside information on June 10. As a result of this short-swing trading, the Galleon Tech funds generated additional actual profits of over $6.6 million.

27. ***Total Short-Swing Profits From Mr. Gupta's Inside Information About Second Quarter Results.*** The total actual profits made by the Galleon Tech funds by virtue of short-swing trading based on Mr. Gupta's inside information concerning Goldman Sachs' second quarter 2008 results exceeded $13.6 million. Mr. Gupta had or shared influence and control over the Galleon Tech funds' short-swing trading in these Goldman Sachs securities, because Mr. Gupta knew, and intended, that his disclosure of this material, nonpublic information to Mr. Rajaratnam would trigger the short-swing trading activity described above.

## MR. GUPTA'S DISCLOSURE TO MR. RAJARATNAM OF BERKSHIRE HATHAWAY'S $5 BILLION INVESTMENT IN GOLDMAN SACHS

28. ***September 21, 2008 Board Meeting.*** In mid-September, 2008, Goldman Sachs senior management began considering potential investments from institutional investors like Berkshire Hathaway Inc. ("Berkshire Hathaway"). According to the SEC, such an institutional investment was discussed at Goldman Sachs board meetings and posting calls during the second half of September 2008. The Goldman Sachs board convened a special board meeting on Sunday, September 21, 2008. During that meeting, the board approved Goldman Sachs becoming a bank holding company. The Goldman Sachs board was also updated on certain strategic alternatives that had been considered over the weekend, including potential investments from institutional investors like Berkshire Hathaway. Mr.

Gupta participated in the board meeting via teleconference.  According to phone records, Mr. Gupta called in at 4:42 p.m. and remained on the line for 47 minutes.

29.    ***Goldman Sachs' Surprisingly Strong Net Revenue and Potential Institutional Investments Remain Confidential***.  Goldman Sachs CEO Lloyd Blankfein had a long-standing practice of informing the board during posting calls, meetings, and phone calls about the then-current financial status of the firm. Goldman Sachs' net revenues had been particularly strong in the week leading up to the September 21 meeting despite the fact that the financial markets were in a general state of turmoil.  The board's determination to convert Goldman Sachs into a bank holding company was publicly disclosed on the evening of September 21. However, information concerning potential investments from institutional investors like Berkshire Hathaway, as well as Goldman Sachs' strong net revenue, continued to remain private and confidential.

30.    ***Insider Trading on September 22, 2008***.  The following morning (September 22, 2008), Mr. Gupta spoke to Mr. Rajaratnam and/or Mr. Rajaratnam's colleagues through at least one phone call that lasted approximately four minutes. Less than an hour after this conversation, Mr. Rajaratnam caused the Galleon Tech funds, which held no preexisting long or short position in Goldman Sachs securities at the time, to purchase 100,000 Goldman Sachs shares.  Mr. Gupta spoke to Mr. Rajaratnam at least two more times later that day.

31.    ***Insider Trading on September 23, 2008***.  Mr. Rajaratnam also placed a call to Mr. Gupta on the morning of September 23, 2008.  The call lasted over 14

minutes. Soon after the call began, Mr. Rajaratnam caused the Galleon Tech funds to purchase 50,000 additional Goldman Sachs shares.

32. ***September 23, 2008, Special Board Meeting re: $5 Billion Berkshire Hathaway Investment.*** Later that same day, at 3:15 p.m., the Goldman Sachs board held a special telephonic meeting wherein it considered and approved a $5 billion preferred stock investment by Berkshire Hathaway in Goldman Sachs and a public equity offering. As Mr. Gupta knew (and as Mr. Blankfein testified at the Rajaratnam insider trading trial), Warren Buffett's Berkshire Hathaway was one of the most respected and influential investors. Its decision to make a massive investment in Goldman Sachs would likely be viewed as a strong vote of confidence in Goldman Sachs when the information was disclosed to the public. Such a large amount of new capital in Goldman Sachs also would likely be viewed favorably by investors. It was, as Mr. Blankfein called it, "big news."

33. ***Insider Trading on September 23, 2008.*** Mr. Gupta participated in the September 23, 2008 special board meeting telephonically, staying connected to the call until approximately 3:53 p.m. Within minutes after disconnecting from the call, Mr. Gupta again called Mr. Rajaratnam—and with just minutes before the close of the markets, at approximately 3:58 p.m., Mr. Rajaratnam caused the Galleon Tech funds to purchase approximately 217,200 additional Goldman Sachs shares. These purchases were partial fills of orders of 250,000 shares (approximate value of $31 million) and 100,000 shares (approximate value of $21 million), respectively. The following morning (September 24, 2008) at 7:09 a.m., Mr. Rajaratnam informed his

personal trader, Ian Horowitz, that he (Mr. Rajaratnam) received the information upon which he placed the trades minutes before the close.  Mr. Rajaratnam characterized those remaining minutes of the September 23 trading day as "big drama."  He "got a call at 3:58 . . . [s]aying something good might happen to Goldman."

34.    *Later Public Disclosure and Immediate Increase in Goldman Sachs Stock Price*.  Goldman Sachs publicly announced the Berkshire Hathaway investment, along with a $2.5 billion public stock offering, after the market closed on September 23.  Goldman Sachs' stock price, which had closed at $125.05 per share on September 23, opened at $128.44 per share the following day.  It rose to a closing price on September 24 of $133.00 per share, a gain of 6.36% from the prior day's closing price.

35.    *Short-Swing Profits*.  On September 24, Mr. Rajaratnam caused the Galleon Tech funds to liquidate the long position they had built in mid-September. As a result of Mr. Rajaratnam's short-swing trading based on Mr. Gupta's inside information, the Galleon Tech funds generated actual profits of close to $1 million. Mr. Gupta had or shared influence and control over the Galleon Tech funds' short-swing trading in these Goldman Sachs securities, because Mr. Gupta knew, and intended, that his disclosure of this material, nonpublic information to Mr. Rajaratnam would trigger the short-swing trading activity described above.

## MR. GUPTA'S FURTHER DISCLOSURE OF INSIDER INFORMATION TO MR. RAJARATNAM ABOUT GOLDMAN SACHS' FINANCIAL RESULTS

36.     *October 21, 2008 Stock Purchase.*  On October 21, 2008, Mr. Rajaratnam caused the Galleon Tech funds to purchase 150,000 shares of Goldman Sachs stock.

37.     *October 23, 2008, Board Conference Call.*  Goldman Sachs CEO Lloyd Blankfein began to appreciate early in the fourth quarter of 2008 that Goldman Sachs' financial results were going to be poor.  About mid-quarter, on October 23, 2008, at 4:15 p.m., Mr. Blankfein, Goldman Sachs Chief Financial Officer David Viniar, and other Goldman Sachs senior executives conducted a board posting call during which they informed the board of Goldman Sachs' then-current financial situation.  At the time, Goldman Sachs was operating at a quarter to date loss of $1.96 per share.  Mr. Gupta participated in the conference call.  He dialed into the meeting at 4:16 p.m. and remained on the call for 33 minutes, until just shy of 4:50 p.m.  Mr. Gupta then called Mr. Rajaratnam a mere 23 seconds later.

38.     *Insider Trading on October 24, 2008.*  Mr. Gupta called Mr. Rajaratnam on October 23, 2008 at 4:50 p.m.  This Gupta-Rajaratnam call lasted approximately 13 minutes.  The financial markets already had closed.  The following morning, just as the markets opened at 9:30 a.m., Mr. Rajaratnam caused the Galleon Tech funds to begin selling their holdings of Goldman Sachs stock.  The funds finished selling off their holdings—which had consisted of over 120,000 shares—that same day at prices ranging from $97.74 to $102.17 per share.  The same day (October 23, 2008), in discussing trading and market information with

another participant in the trading scheme (David Lau), Mr. Rajaratnam explained

that Wall Street expected Goldman Sachs to increase its share price by $2.50 per

share but that he (Mr. Rajaratnam) had heard the prior day from a Goldman Sachs

board member—*i.e.*, Mr. Gupta—that Goldman Sachs was actually going to lose $2

per share:

| | |
|---|---|
| RAJ RAJARATNAM: | *. . . I heard yesterday from somebody who's on the Board of Goldman Sachs [Mr. Gupta], that they are gonna lose $2 per share. The Street has them making $2.50.* |
| DAVID LAU: | Really. |
| RAJ RAJARATNAM: | [T]hey don't report until December, they, I think their quarter ends in November . . . . [T]hey have these huge marks in ICBC [Industrial and Commercial Bank of China] and all that stuff right.  That uh is getting clobbered. . . . |
| DAVID LAU: | Right. |
| RAJ RAJARATNAM: | *So what he [Mr. Gupta] was telling me was that uh, Goldman, the quarter's pretty bad.* They have zero revenues because their trading revenues are offset by asset losses, and *to date they have lost $2 per share*, they just announced a 10% cut and uh you know, the basic business is ok but uh you know this is uh tough for them.  *I don't think that's built into the Goldman Sachs stock price.* So if it gets to $105, I'm gonna, it's $99 now, it was $102.  I was looking for $105, *I'm gonna whack it you know.* |

(Emphasis added.)

39.     *Later Public Disclosure of Fourth Quarter 2008 Results.* Goldman

Sachs publicly announced negative results for the fourth quarter of 2008

approximately six weeks later, on December 16, 2008.  Goldman Sachs reported a $2.1 billion loss.  This was its first and only quarterly loss as a publicly traded company.

40.    *Avoidance of Losses*.  As a result of Mr. Rajaratnam's short swing trading in October 2008 based on Mr. Gupta's inside information, the Galleon Tech funds avoided losses of over $3 million.  Mr. Gupta had or shared influence and control over the Galleon Tech funds' sale of these Goldman Sachs securities, because Mr. Gupta knew, and intended, that his disclosure of this material, nonpublic information to Mr. Rajaratnam would trigger the selling activity described above.

## MR. GUPTA'S BENEFICIAL OWNERSHIP OF GOLDMAN SACHS STOCK TRADED ON SHORT-SWING BY MR. RAJARATNAM

41.    *Mr. Gupta's Status as a Section 16(b) Insider*.  Mr. Gupta was a statutory insider at all times relevant to this Section 16(b) claim because he was a director of Goldman Sachs between November 2006 and May 2010.  As a statutory insider, Mr. Gupta was obligated to report transactions in Goldman Sachs securities of which he was a "beneficial owner."  15 U.S.C. § 78p(a)(1).  As a statutory insider, he also is obligated to disgorge any profits made from short-swing transactions in those beneficially-owned securities.  15 U.S.C. § 78p(b).

42.    *Beneficial Ownership and Pecuniary Interest Definitions*.  SEC Rule 16a-1(a)(2) broadly defines a "beneficial owner" as:

> any person who, directly or indirectly, though any contract, arrangement, understanding, relationship or otherwise, has or shares a *direct or indirect pecuniary interest* in the equity securities.

- 19 -

17 C.F.R. § 240.16a-1(a)(2) (emphasis added).  SEC Rule 16a-1(a)(2)(i) broadly

defines "pecuniary interest" as:

> the opportunity, directly or indirectly, to profit or share in any
> profit derived from a transaction in the subject securities.

17 C.F.R. § 240.16a-1(a)(2)(i).

43.  *Mr. Gupta Had the Opportunity to Profit or Share in Profit from His*

*Numerous Business Collaborations with Mr. Rajaratnam.*  According to the SEC

Order:

> During the relevant period, Gupta had a variety of business
> dealings with Rajaratnam and stood to benefit from his
> relationship with Rajaratnam.  In addition, Gupta was an
> investor in, and a director of, Galleon's GB Voyager Multi-
> Strategy Fund SPC, Ltd., a master fund with assets that were
> invested in numerous Galleon hedge funds, *including those that
> traded based on Gupta's illegal tips*.

SEC Order ¶ 4 (emphasis added).  As discussed below, Mr. Gupta had far more than

"the opportunity" for pecuniary benefit.  He directly profited from the short-swing

transactions because Mr. Rajaratnam undoubtedly paid Mr. Gupta for his inside

information.  This was Mr. Rajaratnam's modus operandi.

44.  *Mr. Rajaratnam Paid for Inside Information.*  Mr. Rajaratnam's modus

operandi was to pay for inside information—a fact of which Mr. Gupta was well

aware.  On July 29, 2008, Mr. Rajaratnam complained to Mr. Gupta that he

(Rajaratnam) was paying Anil Kumar "a million dollars a year" "[a]ter taxes, off

shore cash" "for doing literally nothing."  Mr. Rajaratnam told Mr. Gupta that Mr.

Kumar is trying to be a "mini-Rajat [Gupta] . . . [w]ithout bringing anything new to

the party . . . ."  Mr. Gupta responded to each of these statements with a matter-of-fact, business-as-usual "Yes.  Yes." or "Yeah.  Yeah."—despite the facts that (a) Mr. Rajaratnam was referring to illegal payments of millions of dollars he had made to Mr. Kumar for disclosing confidential information on McKinsey & Company ("McKinsey") clients; (b) Mr. Gupta knew Mr. Kumar was a longtime partner at McKinsey; and (c) Mr. Gupta himself had served as the CEO of McKinsey for almost a decade and had recently retired as senior partner emeritus.  In short, Mr. Gupta did not flinch during the discussion of Mr. Kumar's betrayal of McKinsey clients in return for millions of dollars in payments from Mr. Rajaratnam.

45.     ***Mr. Rajaratnam Paid Handsomely—and Covertly—When His Insiders Brought Confidential Information "to the Party."***  Mr. Kumar described what Mr. Rajaratnam expected him to bring "to the party" during his March 2011 testimony in the Rajaratnam insider-trading trial.  Mr. Kumar recounted that he was pressured by Mr. Rajaratnam to leak confidential information on McKinsey public companies.  Mr. Rajaratnam told Mr. Kumar:

> You work very, very hard [at McKinsey].  You are underpaid [at McKinsey].  People are making fortunes . . . so just keep track of your knowledge and share it with me.

Mr. Kumar testified that Mr. Rajaratnam paid him approximately $1.75 million in hidden payments for the confidential information on McKinsey clients that Mr. Kumar provided to Mr. Rajaratnam.  These payments included transactions through off-shore companies in the name of Mr. Kumar's housekeeper.  Mr. Kumar also testified that he supplied confidential details to Mr. Rajaratnam about

Advanced Micro Devices' ("AMD's") 2006 purchase of graphics chip-maker ATI
Technologies:

> He called me at home and he said, "I just wanted to thank you.
> That was fantastic, we are all cheering you at the office right
> now." That made me very nervous. I was worried if there was a
> lot of champagne flowing in the office.

Mr. Kumar further testified that he "nearly fell off my chair" when Mr. Rajaratnam
paid him a $1 million "bonus" for the information on the AMD $5.4 billion buyout of
ATI. Mr. Rajaratnam made more than $20 million on his trades, according to the
government.

46. ***Mr. Gupta Knew that Mr. Rajaratnam Paid "Bonuses" for Inside
Information***. Mr. Gupta and Mr. Rajaratnam likewise discussed the concept of
paying a "bonus" for valuable inside information—albeit in thinly disguised,
euphemistic terms. Mr. Gupta called Mr. Rajaratnam on July 29, 2008, at 5:39 p.m.
During this call, Mr. Rajaratnam told Mr. Gupta that if Mr. Kumar "comes and does
a big deal and he's instrumental in orchestrating a deal and getting it done, right?
People might say, hey here is a bonus, you know?" Mr. Gupta responded, "Yeah."

47. ***Mr. Gupta Angled for Further "Positions" in Rajaratnam-Controlled
Galleon Funds***. Giving equity interests—"participation"—in one or more of the
Galleon-related funds was another manner in which Mr. Rajaratnam
surreptitiously paid for inside information. During their July 29, 2008 telephone
conversation, Mr. Rajaratnam related to Mr. Gupta that Mr. Kumar also wanted to
"participate somehow in Galleon International"—a fund Galleon described as "an
opportunistic Asia-focused fund." During that same call, Mr. Gupta inquired about

participating in Mr. Rajaratnam's larger Galleon Group, despite having already been given an equity position in his Galleon International fund.  Mr. Gupta implored Mr. Rajaratnam "to keep having the dialogue as to . . . how I can be helpful in Galleon International.  By the way not Galleon International, Galleon Group.  I mean *you've given . . . a position in Galleon International*.  That's good enough." (Emphasis added.)

48.     ***Mr. Rajaratnam Paid Mr. Gupta Through Heightened Interests in Galleon Funds.***  Mr. Gupta also had an agreement with Mr. Rajaratnam concerning an interest in the Galleon's Voyager Funds ("Voyager") (a/k/a Voyager Multi-Strategy).  As discussed during their July 29, 2008 call:

| | |
|---|---|
| RAJ RAJARATNAM: | So, I'm gonna get George [Lau, Galleon Group's Chief Financial Officer] to . . . write the balances, if you want. |
| RAJAT GUPTA: | Well, what I did is I, you know, uh, as we agreed, I just did the calculations for the (UI). |
| RAJ RAJARATNAM: | Yes. (UI) Right. . . .  So George will just certify that and (UI), send you uh . . . . I mean, I, I'll you know, I'll do it on my Galleon letterhead, (UI). |

By letter dated August 4, 2008, written on "Galleon letterhead," Mr. Rajaratnam represented "To Whom it May Concern" that Mr. Gupta's balance in Voyager was $16,406,974 through June 30, 2008—a mere few weeks after Mr. Gupta's inside information on Goldman Sachs' second quarter results resulted in a $13.6 million short-swing profit for the Galleon funds.  Mr. Gupta's balance in Voyager was calculated based on something other than direct fair market value payments by Mr.

Gupta for fund shares.  It is most likely, and is therefore alleged, that at least a portion of Gupta's $16,406,974 balance in Voyager was a quid pro quo for bringing something new "to the party" in the form of inside information on Goldman Sachs securities that were profitably traded on the short-swing.

49.     ***Mr. Gupta's Breach of Goldman Sachs' Code of Conduct.***  Savvy businessmen like Mr. Gupta do not risk everything for nothing.  Mr. Gupta's conduct not only created massive legal and financial exposure to himself personally, but also serious reputational risk to himself, Goldman Sachs, and McKinsey.  CEO Blankfein testified in the Rajaratnam insider-trading trial that Mr. Gupta's divulging of nonpublic information from Goldman Sachs' board meetings to Mr. Rajaratnam violated the company's confidentiality policy.  As a Goldman Sachs director, Mr. Gupta had an obligation to keep confidential all material, nonpublic information about the company and its plans.  As a director, Mr. Gupta was well aware that providing inside information to Mr. Rajaratnam violated the Company's ethical rules and, if made public, would cause harm to his own and Goldman Sachs' standing in the public's eyes.  The company's Corporate Governance Guidelines explicitly state:

> *Confidentiality.*  The proceedings and deliberations of the Board and its committees shall be confidential.  Each director shall maintain the confidentiality of information received in connection with his or her service as a director.

The Goldman Sachs Code of Business Conduct and Ethics likewise requires protection of confidential information, which explicitly includes non-public information about the company's "businesses, financial performance, results or

prospects."  The ethical code is "viewed as the ***baseline of expected behavior*** at the firm" and was enacted, in part, to further the company's "business and reputation." (Emphasis added.)  As CEO Blankfein states in the preamble:

> No financial incentive or opportunity—regardless of the bottom line—justifies a departure from our values.  In fact, ***loosening our ethical standards in pursuit of business is a betrayal of our duty to clients, shareholders and colleagues and compromises everything we aspire as a firm***.

(Emphasis added.)

## CAUSE OF ACTION

### *Short-Swing Profits Generated in Violation of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).*

50.     ***Incorporation.***  The allegations in the preceding paragraphs are incorporated as if fully set forth herein.

51.     ***Profits from Short-Swing Transactions.***  Mr. Gupta had a direct or indirect pecuniary interest sufficient to establish his beneficial ownership of Goldman Sachs securities that Mr. Rajaratnam caused to be traded on the short swing (within periods of less than six months) during the period of June 2008 through October 2008.

52.     ***Disgorgement to Goldman Sachs.***  Pursuant to Section 16(b), Mr. Gupta must disgorge to Goldman Sachs all profits, with interest, from the short-swing transactions in Goldman Sachs stock of which he is beneficial owner, in amounts to be proven at trial pursuant to the "lowest price in, highest price out—within six months" method as described in the landmark Second Circuit decision, *Smolowe v. Delendo Corp.*, 136 F.2d 231, 239 (2d Cir. 1943).  These disgorgeable

profits will likely far exceed the actual profits.  However, as Second Circuit Chief Judge Learned Hand noted, in re-affirming the *Smolowe* method, Section 16(b)'s "crushing liabilities . . . should certainly serve as a warning, and may prove a deterrent."  *Gratz v. Claughton*, 187 F.2d 46, 52 (2d Cir. 1951).

## REQUESTED RELIEF

Plaintiff respectfully requests the following relief:

(a)     Judgment against Defendant for all profits from short-swing transactions under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), in amounts to be proven at trial;

(b)     An award of pre-judgment and post-judgment interest on all amounts awarded or restitution or disgorgement ordered;

(c)     An award of costs and attorneys' fees against Defendant; and

(d)     Such other and further relief that this Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a jury trial on all triable issues.  *See* Fed. R. Civ. P. 38.

Dated:   New York, New York
         June 6, 2011.

                         KELLER ROHRBACK L.L.P.

                         By:

                         David S. Preminger
                         770 Broadway, 2nd Floor
                         New York, New York 10003
                         Telephone:  (646) 495-6198
                         Facsimile:  (646) 495-6197
                         Email:  dpreminger@kellerrohrback.com

                         William C. Smart*

- 26 -

Ian S. Birk*
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: wsmart@kellerrohrback.com
Email: ibirk@kellerrohrback.com

**GORDON TILDEN THOMAS & CORDELL LLP**

Jeffrey I. Tilden*
Mark A. Wilner*
Haley K. Krug*
David M. Simmonds*
1001 Fourth Avenue, Suite 4000
Seattle, Washington 98154
Telephone: (206) 467-6477
Facsimile: (206) 467-6292
Email: jtilden@gordontilden.com
Email: mwilner@gordontilden.com
Email: hkrug@gordontilden.com
Email: dsimmonds@gordontilden.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

# EXHIBIT 1

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response...... | 0.5 |

(Print or Type Responses)

1. Name and Address of Reporting Person*

(Last)  (First)  (Middle)

(Street)

(City)  (State)  (Zip)

2. Issuer Name and Ticker or Trading Symbol

3. Date of Earliest Transaction Required to be Reported (Month/Day/Year)

4. If Amendment, Date Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

___ Director   ___ 10% Owner
___ Officer (give title below)   ___ Other (specify below)

6. Individual or Joint/Group Filing (Check Applicable Line)
___ Form filed by One Reporting Person
___ Form filed by More than One Reporting Person

**Table I — Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC 1474 (01-05)   (Over)

FORM 4 (continued)

Table II — Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned following Reported Transaction(s)(Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

Explanation of Responses:

_____
**Signature of Reporting Person

_____
Date

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.
See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient,
see Instruction 6 for procedure.

Potential persons who are to respond to the collection of information contained in this form are not
required to respond unless the form displays a currently valid OMB Number.

EXHIBIT 2

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 9192 / March 1, 2011

SECURITIES EXCHANGE ACT OF 1934
Release No. 63995 / March 1, 2011

INVESTMENT ADVISERS ACT OF 1940
Release No. 3167 / March 1, 2011

INVESTMENT COMPANY ACT OF 1940
Release No. 29580 / March 1, 2011

ADMINISTRATIVE PROCEEDING
File No. 3-14279

|  |  |
|---|---|
| In the Matter of<br><br>Rajat K. Gupta,<br><br>Respondent. | ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, SECTION 203(f) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940 |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Rajat K. Gupta ("Respondent" or "Gupta").

## II.

After an investigation, the Division of Enforcement alleges that:

### A. SUMMARY

1.       This matter concerns insider trading by Rajat K. Gupta ("Gupta"), who on a number of occasions disclosed material nonpublic information that he obtained in the course of his duties as a member of the Boards of Directors of The Goldman Sachs Group, Inc. ("Goldman Sachs") and The Procter & Gamble Company ("Procter & Gamble") to Raj Rajaratnam ("Rajaratnam"), the founder and a Managing General Partner of the hedge fund investment adviser Galleon Management, LP ("Galleon").  Rajaratnam, in turn, either caused the Galleon hedge funds that he managed to trade based on the material nonpublic information, or passed the information on to others at Galleon and caused trades based on the information.

2.       Specifically, Gupta disclosed to Rajaratnam material nonpublic information concerning Berkshire Hathaway Inc's ("Berkshire") $5 billion investment in Goldman Sachs before it was publicly announced on September 23, 2008, as well as Goldman Sachs's financial results for both the second and fourth quarters of 2008.  Rajaratnam caused the various Galleon hedge funds that he managed to trade based on the material nonpublic information, generating illicit profits and loss avoidance of more than $17 million.  In addition, Gupta disclosed to Rajaratnam material nonpublic information concerning Procter & Gamble's financial results for the quarter ending December 2008.  Rajaratnam relayed this information to others at Galleon, who caused Galleon funds to trade based on the information, generating illicit profits of over $570,000.

3.       In the course of carrying out the insider trading scheme, Rajaratnam informed certain conspirators that he obtained nonpublic information concerning Goldman Sachs from his source on the company's Board.  Rajaratnam informed at least one other conspirator that he obtained nonpublic information concerning Procter & Gamble from his source on Procter & Gamble's Board.  As set forth below, Gupta was Rajaratnam's source on both companies' Boards and knowingly or recklessly disclosed material nonpublic information to Rajaratnam for use in trading activities.

4.       During the relevant period, Gupta had a variety of business dealings with Rajaratnam and stood to benefit from his relationship with Rajaratnam.  In addition, Gupta was an investor in, and a director of, Galleon's GB Voyager Multi-Strategy Fund SPC, Ltd., a master fund with assets that were invested in numerous Galleon hedge funds, including those that traded based on Gupta's illegal tips.

5.       By virtue of his conduct, Gupta willfully violated Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B. RESPONDENT

6.      *Gupta*, age 62, resides in Westport, Connecticut.  From November 2006 through May 2010, Gupta was a member of Goldman Sachs's Board of Directors.  During his tenure on Goldman Sachs's Board, Gupta served as a member of the Board's Audit Committee, Corporate Governance and Nominating Committee, and Compensation Committee.  Since 2007, Gupta has also been a member of Procter & Gamble's Board of Directors, and has served on the Board's Audit Committee and its Innovation and Technology Committee.  Gupta serves on the Boards of Directors of several other public companies and is affiliated with other entities, both public and private.  Gupta is a Founding Partner and the Chairman of New Silk Route Partners LLC, an investment firm that was originally called Taj Capital Partners and was founded by Gupta, Rajaratnam, and others in 2006.  Gupta holds a Bachelor of Technology degree in mechanical engineering from the Indian Institute of Technology and an MBA from Harvard Business School.

C. OTHER RELEVANT ENTITIES

7.      *Berkshire* is a Delaware corporation headquartered in Omaha, Nebraska.  Berkshire is a holding company that owns subsidiaries engaged in many business activities.  Berkshire's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its stock trades on the New York Stock Exchange ("NYSE") under the symbols "BRK-A" for its Class A shares, and "BRK-B" for its Class B shares.

8.      *Galleon*, a Delaware limited partnership, is a hedge fund investment adviser based in New York, New York.  As of March 2009, Galleon had over $2.6 billion under management.  Galleon was founded in 1997 and registered with the Commission as an investment adviser in January 2006.  In the wake of the October 16, 2009, insider trading arrest of Rajaratnam, Galleon began to liquidate itself and the hedge funds it advised.  During the relevant period, Galleon served as the investment adviser for several hedge funds, including Technology Offshore Fund, Technology Partners Fund, Technology MAC Fund, and the Diversified Fund (collectively, the "Galleon Tech funds").

9.      *Goldman Sachs* is a Delaware corporation headquartered in New York, New York.  Goldman Sachs is a global investment banking, securities, and investment management firm that provides financial services to a client base that includes corporations, financial institutions, governments, and high-net-worth individuals and has a substantial broker-dealer operation.  The subsidiaries of Goldman Sachs include broker-dealers and investment advisers registered with the Commission.  Goldman's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock trades on the NYSE under the symbol "GS."

10.     *Procter & Gamble* is an Ohio corporation headquartered in Cincinnati, Ohio.  Procter & Gamble is a provider of branded consumer goods products in over 180 countries around the world.  Procter & Gamble's securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act and its stock trades on the NYSE under the symbol "PG."

3

11.    *Rajaratnam*, age 53, resides in New York, New York.  Rajaratnam is the founder and a Managing General Partner of Galleon, and, during the relevant period, served as Portfolio Manager of the Galleon Tech funds.  Prior to founding Galleon, Rajaratnam worked at Needham & Co., a registered broker-dealer, for 11 years, at which time he held Series 7 and Series 24 securities licenses.  Rajaratnam obtained a degree from the University of Sussex, England, in 1980, and an MBA in Finance from the Wharton School of the University of Pennsylvania in 1983.

D.    ALLEGATIONS

**Gupta Disclosed Material Nonpublic Information to Rajaratnam Concerning Berkshire's $5 Billion Investment in Goldman Sachs**

12.    In September 2008, Gupta disclosed to Rajaratnam material nonpublic information he learned as a member of the Goldman Sachs Board of Directors concerning, among other things, Berkshire's $5 billion investment in Goldman Sachs, which was publicly announced on September 23, 2008.  Rajaratnam, in turn, caused the Galleon Tech funds to trade based on the material nonpublic information that Gupta disclosed.

13.    Soon after the bankruptcy filing of Lehman Brothers Holdings Inc. ("Lehman") on September 15, 2008 —which sent the financial markets into an unprecedented tailspin — senior management of Goldman Sachs began considering various strategic alternatives as they tried to navigate through the ongoing financial crisis.  These alternatives included a potential investment from an institutional investor like Berkshire, and were variously discussed at Goldman Sachs Board meetings and posting calls during the week and a half following Lehman's bankruptcy filing.

14.    Goldman Sachs executives continued to explore various strategic alternatives the weekend after the Lehman bankruptcy.  The Goldman Sachs Board convened a Special Meeting on Sunday, September 21, 2008.  During that meeting, which Gupta attended via teleconference, the Board approved Goldman Sachs becoming a Bank Holding Company.  The Goldman Sachs Board was also updated on certain strategic alternatives that had been considered over the weekend.

15.    Goldman Sachs CEO Lloyd Blankfein ("Blankfein") had a long-standing practice of informing the Board during posting calls, meetings and phone calls about the then-current financial status of the firm.  Goldman's net revenues had been particularly strong in the week leading up to the meeting – despite the fact that the week had begun with Lehman's bankruptcy and that the financial markets were in a general state of turmoil.  While the Board's determination to convert Goldman Sachs into a Bank Holding Company was publicly disclosed on the evening of September 21, information concerning Goldman Sachs's strategic alternatives and strong net revenue remained confidential.

16.    Telephone records and calendar entries indicate that, on the morning of Monday, September 22 — the day after the Sunday evening Goldman Sachs Board

4

meeting — Gupta and Rajaratnam very likely had a telephone conversation. Shortly after that conversation, Rajaratnam caused the Galleon Tech funds, which held no preexisting long or short position in Goldman Sachs securities at the time, to purchase over 80,000 Goldman Sachs shares.

17.    On the morning of September 23, Rajaratnam placed a call to Gupta which lasted over 14 minutes. Less than a minute after the call began, Rajaratnam caused the Galleon Tech funds to purchase more than 40,000 additional Goldman Sachs shares.

18.    A Special Telephonic Meeting of the Goldman Sachs Board was convened at 3:15 p.m. on September 23, during which the Board considered and approved a $5 billion preferred stock investment by Berkshire in Goldman Sachs and a public equity offering. As Gupta knew, Berkshire was one of the most respected and influential investors and its decision to make such a large investment in Goldman Sachs would likely be viewed as a strong vote of confidence in the firm when the information was disclosed to the public. The infusion of a large amount of new capital in the firm also would likely be viewed favorably by investors. Gupta participated in the Board meeting telephonically, staying connected to the call until approximately 3:53 p.m. Immediately after disconnecting from the Board call, Gupta called Rajaratnam from the same line. Within a minute after this telephone conversation, at 3:56 p.m. and 3:57 p.m., and just minutes before the close of the markets, Rajaratnam caused the Galleon Tech funds to purchase more than 175,000 additional Goldman Sachs shares. Rajaratnam later informed a conspirator that he received the information upon which he placed the trades minutes before the close.

19.    Goldman Sachs publicly announced the Berkshire investment, along with a $2.5 billion public stock offering, after the market close on September 23. Goldman Sachs's stock price, which had closed at $125.05 per share on September 23, opened at $128.44 per share the following day and rose to a closing price that day of $133.00 per share, a gain of 6.36% from the prior day's closing price.

20.    On September 24, Rajaratnam caused the Galleon Tech funds to liquidate the long position they had built on September 23, generating profits of over $900,000.

## Gupta Disclosed Material Nonpublic Information to Rajaratnam Concerning Goldman Sachs's Financial Results for the Fourth Quarter of 2008

21.    Gupta also disclosed material nonpublic information that he learned during a Goldman Sachs Board posting call about Goldman Sachs's financial results for the fourth quarter of 2008 to Rajaratnam, who caused the Galleon funds he managed to trade based on the information.

22.    Goldman Sachs announced negative results for the fourth quarter of 2008 on December 16, 2008, reporting a $2.1 billion loss, its first (and only) quarterly loss as a publicly traded company.

23.    Blankfein began to appreciate very early in the quarter that results were going to be poor.  About mid-quarter, on October 23, 2008 at 4:15 p.m., Blankfein, Goldman Sachs Chief Financial Officer David Viniar ("Viniar"), and other senior executives at Goldman Sachs conducted a Board posting call during which they informed the Board of the company's then-current financial situation.  The daily and weekly profit and loss statements that Blankfein and Viniar would typically rely on as the basis for their presentations to the Board show that the company was then operating at a quarter to date loss of $1.96 per share at the time.

24.    Gupta dialed into the October 23, 2008, Board meeting around the time it was scheduled to start and remained on the call until 4:49 p.m.  Just 23 seconds after disconnecting from the call, Gupta called Rajaratnam.  The call lasted approximately 13 minutes.  The following morning, just as the financial markets opened at 9:30 a.m., Rajaratnam caused the Galleon Tech funds to begin selling their holdings of Goldman Sachs stock.  The funds finished selling off their holdings — which had consisted of over 120,000 shares — that same day at prices ranging from $97.74 to $102.17 per share.  The same day (October 24, 2008), in discussing trading and market information with another participant in the trading scheme, Rajaratnam explained that Wall Street expects Goldman Sachs to earn $2.50 per share but that Rajaratnam had heard the prior day from a member of the Goldman Sachs Board that the company was actually going to lose $2 per share.  As a result of Rajaratnam's trades based on the material nonpublic information that Gupta provided, the Galleon Tech funds avoided losses of over $3 million.

### Gupta Disclosed Material Nonpublic Information to Rajaratnam Concerning Goldman Sachs's Financial Results for the Second Quarter of 2008

25.    Gupta also disclosed to Rajaratnam material nonpublic information concerning Goldman Sachs's positive financial results for the second quarter of 2008, which were publicly announced on June 17, 2008.  Rajaratnam caused the Galleon funds he managed to trade based on the information.

26.    Approximately one week before the announcement, on June 10, 2008, at 5:41 p.m., Blankfein placed a call to Gupta that lasted more than 8 minutes.  The call was one of several Blankfein made to various Goldman Sachs outside directors around the same time that evening.  Blankfein's practice was to apprise Directors of the then-current financial status of the firm when he spoke to them.

27.    Goldman Sachs's second quarter of 2008 had ended on May 30, 2008.  By June 10, 2008, Goldman Sachs's financial reporting team had already compiled and analyzed the quarterly financial data and put together a draft earnings press release that had been circulated to various finance personnel, including Viniar, prior to Blankfein's call with Gupta.  The company's financial performance was strong in an extremely difficult environment, and significantly better than analyst consensus estimates.

28.    Blankfein knew the earnings numbers (which were positive) and discussed them with Gupta during their June 10, 2008, telephone conversation.

29.     On the night of June 10, 2008, at 9:24 p.m., Gupta placed a short call to Rajaratnam's home.  The call was the first in a flurry of short calls between the two over an 18-minute span that night, which culminated in a 4-minute call from Rajaratnam to Gupta, at 9:42 p.m.  On the following morning, June 11, at 8:43 a.m., Rajaratnam placed another call to Gupta that lasted about 2.5 minutes.  Beginning at 9:35 a.m., minutes after the markets opened, Rajaratnam caused the Galleon Tech funds to significantly increase an existing long position it had established in Goldman Sachs shares by purchasing over 5,500 Goldman Sachs June $170 call option contracts (Goldman Sachs's share price had opened at $167.00 per share on June 11).

30.     Rajaratnam also caused the Galleon Tech funds to purchase over 350,000 additional Goldman Sachs shares on June 11 and 12, selling only a small portion on June 13.

31.     On June 16, after a positive Goldman Sachs earnings preview was issued sending Goldman Sachs's stock price up more than 2%, Rajaratnam caused the Galleon Tech funds to sell the June $170 call option contracts they had purchased on June 11, generating profits of approximately $7 million.

32.     On June 17, prior to market open, Goldman Sachs announced its quarterly results.  Revenues and earnings per share beat analysts' estimates, and Goldman Sachs's share price opened the day at $185.04 per share — about 1.62% higher than the prior day's closing price of $182.09 per share.  After the announcement, Rajaratnam caused the Galleon Tech funds to sell the Goldman Sachs shares they had purchased after Rajaratnam received the material nonpublic information from Gupta on June 10, generating profits of over $6.6 million.

33.     The total illicit profits made by the Galleon Tech funds by virtue of their trading based on Gupta's material nonpublic information concerning Goldman Sachs's second quarter of 2008 results exceeded $13.6 million.

**Gupta Disclosed Material Nonpublic Information to Rajaratnam Concerning Procter & Gamble's Financial Results for the Quarter Ending December 2008**

34.     Gupta also disclosed to Rajaratnam material nonpublic information that Gupta learned as a member of Procter & Gamble's Board of Directors about Procter & Gamble's financial results for the October through December 2008 quarter.  Rajaratnam then passed the material nonpublic information to his Galleon colleagues, who then caused Galleon funds to trade based on the information.

35.     At 9:00 a.m. on January 29, 2009, the day before Procter & Gamble's pre-market quarterly earnings release was issued, Procter & Gamble's Audit Committee, of which Gupta was a member, met telephonically to discuss the planned release.  Gupta dialed into the Audit Committee meeting at its scheduled start time and remained on the call for over 19 minutes.  A draft of the earnings release, which had been mailed to Gupta

7

and the other committee members two days before the meeting, stated, among other things, that the company expected organic sales, or sales related to preexisting rather than newly acquired business segments, to grow 2-5% in the fiscal year. This compared negatively to the 4-6% growth the company had previously publicly predicted.

36.     Gupta called Rajaratnam in the early afternoon on January 29, 2009. Shortly afterwards, Rajaratnam advised another participant in the insider trading conspiracy that he had learned from a contact on Procter & Gamble's Board that the company's organic sales growth would be lower than expected. In the late afternoon of January 29, 2009, Galleon funds sold short approximately 180,000 Procter & Gamble shares. After Procter & Gamble issued its earnings release in the pre-market on January 30 (the actual release was substantially the same as the draft release Gupta had been provided), Procter & Gamble's stock price, which had closed at $58.22 per share on January 29, opened on January 30 at $56.50 per share. The stock price declined further to $54.50 per share by the close on January 30, down approximately 6.39% from the prior day's closing price.

37.     By virtue of their trades, which were based on the material nonpublic information that Gupta provided to Rajaratnam, the Galleon funds generated illicit profits of over $570,000.

### Gupta's Fiduciary Duty to Keep Confidential All Material, Nonpublic Information about Goldman Sachs

38.     As a Goldman Sachs Director, Gupta had a duty to keep confidential all material, nonpublic information about Goldman Sachs.

39.     Goldman Sachs's Corporate Governance Guidelines in effect and applicable to Gupta during the relevant period provided that the proceedings and deliberations of the Board and its committees were confidential. Moreover, non-employee directors such as Gupta were prohibited from speaking on behalf of the company without consulting the Chief Executive Officer.

### Gupta's Fiduciary Duty to Keep Confidential All Material, Nonpublic Information about Procter & Gamble

40.     As a Procter & Gamble Director, Gupta had a duty to keep confidential all material, nonpublic information about Procter & Gamble.

41.     Procter & Gamble's insider trading policy in effect and applicable to Gupta during the relevant period prohibits him from trading while in possession of material nonpublic information concerning Procter & Gamble, or from conveying that information to others, and specifically prohibits use or disclosure of information included in draft earnings reports as subject to the policies' strictures.

## E. VIOLATIONS

42.    As a result of the conduct described above, Gupta willfully violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in the offer and sale of securities and in connection with the purchase or sale of securities.

## III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A.    Whether the allegations set forth in Section II hereof are true and, in connection therewith, to afford Respondent an opportunity to establish any defenses to such allegations;

B.    What, if any, remedial action is appropriate in the public interest against Respondent pursuant to Section 15(b) of the Exchange Act including, but not limited to, disgorgement and civil penalties pursuant to Section 21B of the Exchange Act;

C.    What, if any, remedial action is appropriate in the public interest against Respondent pursuant to Section 203(f) of the Advisers Act including, but not limited to, civil penalties pursuant to Section 203(i) of the Advisers Act;

D.    What, if any, remedial action is appropriate in the public interest against Respondent pursuant to Section 9(b) of the Investment Company Act including, but not limited to, civil penalties pursuant to Section 9(d) of the Investment Company Act; and

E.    Whether, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent should be ordered to cease and desist from committing or causing violations or future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; whether Respondent should be ordered to pay disgorgement pursuant to Section 8A(e) of the Securities Act and Section 21C(e) of the Exchange Act and penalties pursuant to Section 8A(g) of the Securities Act and Section 21B(a)(2) of the Exchange Act; and whether other appropriate relief should be granted in the public interest, including a prohibition from service as an officer or director of any issuer pursuant to Section 8A(f) of the Securities Act and Section 21C(f) of the Exchange Act.

## IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondent shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondent personally or by certified mail.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Elizabeth M. Murphy
Secretary

10